
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71453-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL JOHN WILCKEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: May 11, 2015 |
| | ) | |

BECKER, J. — Daniel Wilcken appeals his convictions on four counts involving the sexual abuse of children. He contends that the trial court erred in denying two motions for a mistrial on the grounds of prosecutorial misconduct and by admitting evidence of prior sex offenses. We affirm.

## FACTS

Wilcken has two daughters who were elementary and middle-school aged at the time of the offenses. HJ met Wilcken's younger daughter at school when she was 10 years old. HJ and Wilcken's younger daughter became friends and HJ frequently slept over at the Wilcken's home. One night, when HJ was 12 years old, she woke up to discover Wilcken in bed with her. Wilcken had his hand inside her underwear and his fingers were tangled in her pubic hair. The following morning, Wilcken apologized. HJ did not know what to do and was worried that she would get into trouble if she told anyone.

On another occasion, HJ fell asleep on Wilcken's living room couch. HJ woke up to discover Wilcken attempting to pull her pants off. HJ pretended to be asleep, and eventually Wilcken abandoned the attempt.

Wilcken told HJ he was writing and producing a television show and offered to let HJ star in it. Wilcken told HJ he needed to create a "digital stunt double" of her and to do so, he needed to photograph her in the nude. Wilcken took nude photographs of HJ on several occasions. On one of these occasions, Wilcken groped and twisted HJ's nipple. Wilcken also asked HJ if he could kiss her and take a close-up photograph of her vagina. These events involving HJ were the basis for count 1, child molestation in the second degree.

CS met Wilcken's older daughter at church when she was 12 years old. CS quickly became close to Wilcken's older daughter because she did not have many friends and because the two girls had a shared interest. Like HJ, CS was frequently invited to spend the night at Wilcken's home. On her first overnight visit, CS woke to Wilcken straddling her. CS noticed that her pajama shirt was pulled up, exposing her chest, and Wilcken had his hand in her pajama pants, over her underwear. CS grabbed her clothes and ran into the bathroom. When CS came out, Wilcken asked CS "if it felt good," and CS said no. Wilcken told CS not to tell anyone about the incident. He then took CS to a store and offered to buy her a DVD if she agreed to not tell anyone. Afraid to lose her friendship with her only friend, CS continued to regularly spend the night at Wilcken's house but would wrap herself tightly in blankets and sleep as close to Wilcken's older daughter as she could.

On three subsequent occasions, CS awoke to find Wilcken standing in the corner of the room.

Wilcken told CS he wanted her to star in a movie that he had written. He told her he wanted to create a "virtual character" of her and to do so he would need to photograph her entire body in the nude. CS refused. Wilcken later showed CS nude photos he had taken of his two daughters. These events involving CS were the basis for count 2, attempted child molestation in the second degree.

SE met Wilcken's younger daughter at school when she was 10 years old. They quickly became friends. SE began spending the night at Wilcken's house two or three times a month. One night, Wilcken entered the room where SE was sleeping. Wilcken told SE to "scoot over" and lay down next to her. He put his hand inside her pajama pants and underwear and rubbed her vaginal area. SE pretended to be asleep "because it was a very confusing situation for me and I wasn't sure if I was supposed to know or react." Wilcken told SE "not to tell [her] family because they wouldn't understand." Wilcken frequently told SE that his family loved and appreciated her.

Wilcken told SE that he was making a movie and needed some "anatomy references" for his "animation program." He asked to photograph SE in the nude. SE was uncomfortable but agreed because Wilcken was also photographing his younger daughter in the nude and because she wanted the Wilcken family to continue to like her. These events involving SE were the basis for count 3, child molestation in the first degree.

When TW was eight she met Wilcken's older daughter at school. The girls quickly became best friends, and TW went to Wilcken's home nearly every day. Wilcken told TW's family that he worked with other celebrities and that he "had some connections" and would be able to get TW into modeling. According to TW's older sister, Wilcken took photos of TW in which she was "partially dressed," wearing "bikini tops, booty shorts" and "bent over" with her "legs spread open." Wilcken described himself as TW's "manager" and bought TW expensive gifts such as clothes, roller blades, and a bracelet.

One night, when TW was 11 years old, she woke up to Wilcken pulling her shirt up and exposing her breasts. TW pretended she was asleep and rolled away from Wilcken. TW called her mother and went home. On several subsequent occasions, while showering at Wilcken's home, TW noticed Wilcken watching her through the bathroom window. These events involving TW were the basis for count 4, attempted child molestation in the second degree.

JB's mother, DB, dated Wilcken in the 1980s and remained friends with Wilcken. JB's family frequently stayed overnight at Wilcken's home. On one occasion, when JB was nine years old, she woke up to find Wilcken rubbing her breasts and lower torso underneath her pajamas. JB rolled away and told her mother the next morning. JB and her family did not ever go back to Wilcken's house. These events involving JB were the basis for count 5, child molestation in the first degree.

When interviewed by law enforcement, CS, HJ, and SE initially denied that anything had happened at Wilcken's house but later admitted Wilcken had molested them.

The State charged Wilcken with child molestation in the second degree (count 1), attempted child molestation in the second degree (count 2), child molestation in the first degree (count 3), attempted child molestation in the second degree (count 4), and child molestation in the first degree (count 5). A jury convicted Wilcken on counts 1 through 4 but acquitted him of count 5, the count involving JB. Wilcken appeals.

## ANALYSIS

### Prosecutorial Misconduct

Wilcken claims that the trial court erred when it denied two motions for a mistrial based on the prosecutor's misconduct during voir dire and opening statements. A trial court's decision to deny a motion for a mistrial will be overturned only when there is a substantial likelihood the prejudice affected the jury's verdict. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129 (1995). Because the trial court is in the best position to determine the extent of the prejudice, a trial court's decision is reviewed for an abuse of discretion. State v. Escalona, 49 Wn. App. 251, 254, 742 P.2d 190 (1987). To determine whether the trial court abused its discretion in denying a motion for a mistrial, we examine (1) the seriousness of the irregularity, (2) whether it involved cumulative evidence, and (3) whether the trial court properly

instructed the jury to disregard it. State v. Greiff, 141 Wn.2d 910, 921, 10 P.3d 390 (2000).

Prosecutorial misconduct is a form of trial irregularity. State v. Davenport, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). To establish prosecutorial misconduct, the defendant bears the burden of showing the conduct was both improper and prejudicial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). It is improper for a prosecutor to make comments designed to appeal to the passion and prejudice of the jury, or encourage a verdict based on emotion rather than evidence. State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). We review the allegedly improper comments in the context of the issues presented, the evidence addressed, the instructions given to the jury and the argument of the parties. Russell, 125 Wn.2d at 85-86.

Wilcken first argues that the prosecutor committed misconduct during voir dire when he asked prospective jurors to reflect on their own sexual experiences. He claims this was "tantamount to asking jurors to put themselves in the victims' shoes" and was "designed to create sympathy for the victims."

During voir dire, the prosecutor asked the jury panel to consider whether they would expect child molestation to be committed in the open or in private. The prosecutor then asked the jury panel to recall their first sexual experiences and invited them to talk about their memories.

> I want to shift gears and I want to ask you all to close your eyes at this point. You aren't going to need to lift up your card for this one, but you close your eyes.
> I want you to think back to your first sexual experience. It can be whatever you consider to be your first sexual experience. I

want you to think about who it was with. I want you to think of that person's name. I want you to think about the day's events leading up to that event. Think about where you were when it occurred, who you were beforehand, think about the clothing that you were wearing, think about the time of day, think about what he or she might have said to you leading up to it, think about the feeling that you had when you experienced it, think about the scents that you might have smelled, think about the sounds, think about words that were exchanged, think about how it ended, think about how it felt afterwards, how things were left between you.

I want you to open up your eyes now and I want to ask who would like to come up here and talk about that on the witness stand? I'm not seeing any cards.

When no one volunteered, the prosecutor proceeded to question prospective jurors about why they might be reluctant to tell strangers about a sexual experience and whether they could remember precise details of the experience if it happened long ago.

Wilcken objected. At a sidebar conference, Wilcken moved for a mistrial, contending the prosecutor's questioning was improper because it encouraged prospective jurors to sympathize with the victims by putting themselves in the victims' shoes. The trial court denied the motion.

On appeal, the State defends the prosecutor's remarks, claiming the prosecutor was merely inquiring how prospective jurors might assess a witness's demeanor when describing past events, particularly when those memories were highly personal. This argument is not persuasive. The State is entitled to explore how prospective jurors will evaluate a witness's credibility. But the prosecutor could and should have done so without asking prospective jurors how they would feel if they had to testify in court about intimate sexual activity experienced at a young age. This emotionally charged inquiry was improper.

Nevertheless, the prosecutor's remarks were not so prejudicial as to warrant a mistrial. Given the evidence of Wilcken's guilt, we cannot say there was a substantial likelihood the statements affected the jury's verdict. Moreover, the prosecutor pursued this line of inquiry for several pages before Wilcken objected, at which point the trial court instructed the prosecutor to move on. Wilcken could have alleviated some of the impropriety by raising a contemporaneous objection or requesting a curative instruction. The trial court did not err in denying Wilcken's request for a mistrial.

Wilcken next argues that the prosecutor committed misconduct during opening statement by stating that he brought the case on behalf of the victims. The prosecutor introduced each victim by stating, "we're here for" that victim, showing a photo of the victim and describing the testimony the victim was expected to give.

> We're here for [TW].
> And we're also here for [CS] . . . .
> . . . .
> So we're here for [CS], as well . . . .
> We're also here for [HJ]. . . .
> . . . .
> . . . So we're here for [HJ], as well.
> We're also here for [SE]. . . .
> . . . .
> Oh, yeah. Also here for [JB].

Defense counsel again moved for a mistrial, claiming that the prosecutor had purposefully appealed to the jury's sympathy by encouraging them to align themselves with the victims. The trial court denied the motion.

Again, the prosecutor's statements were improper. A prosecutor does not represent the victims in a criminal trial. State v. Pierce, 169 Wn. App. 533, 558, 280 P.3d 1158, review denied, 175 Wn.2d 1025 (2012). Rather, a prosecutor is "'presumed to act impartially in the interest only of justice.'" State v. Monday, 171 Wn.2d 667, 676 n.2, 257 P.3d 551 (2011) (quoting People v. Fielding, 158 N.Y. 542, 547, 53 N.E. 497 (1899)). Stating "we're here for" the victims improperly suggests that the role of the prosecutor and jury is to seek justice for the victims. Though the State argues that the phrase is harmless because the identity of the referenced group "we" is ambiguous, this is precisely the reason why the use of "we" statements is discouraged. See United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005).

However, the trial court did not err in denying Wilcken's motion for a mistrial. In light of the remainder of the prosecutor's opening statement, which properly focused on outlining the evidence the State planned to introduce, any prejudicial effect was mild. And Wilcken did not object during the prosecutor's opening statement but instead waited to raise the issue once the jury had been excused at the end of the day. If Wilcken had objected, the trial court could have instructed the prosecutor to refrain from using the phrase.

ER 404(b) Evidence

Wilcken contends the trial court erred in admitting evidence of prior uncharged acts of sexual misconduct pursuant to ER 404(b) as evidence of a "common scheme or plan." He argues the evidence was insufficient to establish

a common scheme or plan because the earlier acts were too remote in time and were not sufficiently similar to the charged offenses.

Prior to trial, the State sought to introduce evidence involving four other girls who were molested by Wilcken approximately 20 years prior to the charged offenses.

AC is the younger sister of DB, the mother of JB. When DB dated Wilcken in the 1980s, AC was between seven and nine years old. AC initially liked Wilcken because he gave her attention and took her on fun outings to swimming pools and amusement parks. However, on two of these outings, Wilcken put his hands underneath AC's bathing suit and touched her chest and vaginal area.

AC, her siblings, and their friends frequently had "campouts," where they all slept in sleeping bags on the floor of her parents' living room. On one occasion, Wilcken climbed into AC's sleeping bag and put his hand inside her shirt. AC began sleeping in her closet or her parents' bedroom to avoid Wilcken. When AC expressed discomfort with Wilcken's behavior, Wilcken told her "he was a very physical and affectionate person, that adults didn't understand that, but that's the way he was raised and it was just his personality." Wilcken took lots of photographs of AC, including ones in her bathing suit. Wilcken told AC that he wanted her to be in a movie he was producing and encouraged her to recruit her friends to participate in the movie.

AC stayed with DB and Wilcken at his apartment for approximately a week while her parents were out of town. During that time, AC repeatedly awoke to Wilcken climbing into her bed and putting his hands under her clothes.

MW is another younger sister of DB, approximately two years younger than AC. As with AC, Wilcken took MW on fun outings. On one such occasion, when MW was six or seven, Wilcken, MW, and some of MW's family members were waiting for a ferry back to MW's house. Wilcken put MW on his lap and rubbed her chest and nipples under her shirt for approximately five minutes. On a later occasion, during one of the living room "campouts," Wilcken unzipped MW's sleeping bag and put his hand under her shirt and rubbed her chest and nipples. When MW left the living room and went to her bedroom to escape Wilcken, Wilcken followed her and stood in her bedroom doorway while she pretended to sleep.

KM was a close friend of AC and frequently spent time at her home. On one occasion, when KM was approximately 13, KM attended one of the living room "campouts." She woke up feeling breathing on her face and realized her shirt was pulled up, exposing her left breast. KM heard someone "scurrying" onto the couch and opened her eyes to see Wilcken sleeping or pretending to sleep on the couch.

IS, Wilcken's niece, stayed with the Wilcken family for several days around Christmas when she was approximately 17. One night IS awoke with her shirt pulled up and Wilcken standing over her fondling her breasts. Wilcken took photographs of IS, suggested he could help her become a model, and asked her to have sex with him.

The trial court permitted the State to offer evidence with regard to AC, MW and KM, finding that the evidence showed:

a common scheme or plan by the defendant to establish contact with young girls through females in his life, including his former girlfriend, [DB], and his daughters . . . to develop his own personal relationships with the young girls; to use various methods to desensitize the girls to nudity and physical contact with the defendant, including exposing them to nude photos of other similar aged girls, or appearing in the nude or semi-nude state around the girls, or taking photographs of the girls in dress-up, asking some girls to pose nude for him, and subjecting the girls to seemingly innocuous hugging/groping, kissing, and sitting on his lap; to build a relationship with the girls so that they feel safe around him; to allow them to sleep in his home or a place that is home-like for the defendant; and to touch the young girls on their breasts and/or vaginas as they slept.

The trial court prohibited the State from offering evidence with regard to IS, finding that IS was significantly older than the victims of the charged offenses and her interaction with Wilcken was substantively different due to her maturity.

Under ER 404(b), a court is prohibited from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, "be admissible for any other purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice." State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). "One proper purpose for admission of evidence of prior misconduct is to show the existence of a common scheme or plan." Gresham, 173 Wn.2d at 421. "Proof of such a plan is admissible if the prior acts are (1) proved by a preponderance of the evidence, (2) admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial." State v. Lough, 125 Wn.2d 847, 852, 889 P.2d 487 (1995).

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). A trial court abuses its discretion if it acts on untenable grounds or for untenable reasons. Magers, 164 Wn.2d at 181.

Here, the trial court did not abuse its discretion in admitting the evidence because the acts involving AC, MW, and KM were markedly similar to the acts involving HJ, CS, SE, TW, and JB. In both cases, Wilcken took advantage of a pre-existing relationship to meet preteen girls: he became acquainted with AC, MW, KM, and JB through his girlfriend and HJ, CS, SE and TW through his daughters. In addition, Wilcken developed a sufficiently familiar relationship with all of the girls so that he could have access to them while they slept. Each girl reported waking up and discovering Wilcken removing their clothing or touching their breasts and vaginal areas underneath their clothing. Wilcken developed a bond with AC and MW by providing them with attention and entertainment, similar to how Wilcken acquired the trust of HJ, CS, SE, and TW. Finally, Wilcken took photographs of AC and asked her to star in his movie, similar to what Wilcken did with HJ, CS, SE, and TW. These similarities are, in the words of Wigmore, "'strong indication of a design (not a disposition)'" to molest young girls. Lough, 125 Wn.2d at 858-59 (quoting 2 JOHN H. WIGMORE, EVIDENCE § 357, at 335 (James H. Chadbourn rev. ed. 1979)).

Wilcken argues that any relevance is diminished by the remoteness in time of the prior allegations. But "while the lapse of time between instances may slowly erode the commonality between acts, when similar acts have been

performed repeatedly over a period of years, the passage of time serves to prove, rather than disprove, the existence of a plan." Lough, 125 Wn.2d at 860. Because Wilcken's acts have exhibited a similar pattern over many years, admission of the evidence was a proper exercise of the trial court's discretion.

Statement of Additional Grounds for Review

In a pro se statement of additional grounds, Wilcken contends the trial court erred in failing to suppress evidence because a search warrant was overbroad. But a review of the record shows that the warrant was supported by probable cause and described the items to be seized with sufficient particularity. Wilcken fails to establish a basis for review.

Wilcken argues that police lacked probable cause to arrest him. Because Wilcken did not raise this argument below, he has waived it. RAP 2.5(a).

Wilcken claims his offender score was miscalculated. RCW 9.94A.525(17) requires that an offender receive three points for each prior sex offense. Current convictions are treated as prior convictions. RCW 9.94A.589(1)(a). We see no basis for review.

Wilcken claims that his due process rights were violated because he was not indicted by a grand jury. A grand jury indictment is not required to assure due process of the law. State v. Ng, 104 Wn.2d 763, 774-75, 713 P.2d 63 (1985).

Wilcken claims his sentence violates the equal protection clause and the Eighth Amendment's proscription against cruel and unusual punishment. These

claims will not be considered because they are vague and fail to "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c).

Wilcken argues that the trial court erred in denying his motion to sever count 5 involving JB. We see no basis suggesting reversal would be warranted.

Wilcken argues that the limiting instruction regarding the ER 404(b) evidence was "irrelevant and confusing" because the trial court erred in admitting the evidence. As we hold above, admission of the evidence was not error.

Wilcken claims the evidence was insufficient to prove he committed the offense against SE and that the charging periods for the offenses against HJ and TW are incorrect. These claims are too vaguely stated to permit review.

Wilcken's claims regarding a postseizure hearing, speedy trial, bill of particulars, federal habeas corpus petition, the admissibility of photographs, judicial misconduct, vindictive prosecution and ineffective assistance of counsel appear to rely on facts outside the record and cannot be considered on direct appeal. State v. McFarland, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995).

Affirmed.

Becker, J.

WE CONCUR:

Cox, J.

-15-