[No. 50039-8. En Banc. December 5, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. BENJAMIN KIN NG, *Appellant.*

*Benjamin Kin Ng,* pro se, and *David R. Wohl,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Robert S. Lasnik* and *William L. Downing, Senior Deputies,* for respondent.

DURHAM, J.—Benjamin Ng appeals from a judgment entered upon a jury verdict finding him guilty of 13 counts of aggravated murder and 1 count of first degree assault. Ng contends that the trial court erred by (1) denying his motion to suppress evidence obtained in a search of his room; (2) refusing to admit a codefendant's statement into evidence; (3) concluding that a defendant in a capital case need not be charged by a grand jury indictment and thereby denying his motion to dismiss; and (4) refusing to sequester the jury during the guilt phase of trial. In addition, Ng contends that he was denied due process of law because the prosecutor, in the subsequent trial of the codefendant, argued a factual theory that was inconsistent with the theory argued in his trial. Finding no merit in these contentions, we affirm the judgment and sentence.

At approximately 11:50 p.m. on February 18, 1983, Wai Chin arrived at the Wah Mee Club in Seattle's International District so that he could prepare to perform his job as a dealer of Pai Kew, a Chinese card game. The Wah Mee Club has two levels with several steps connecting the upper with the lower level. Others present when Wai Chin arrived were also employees of the club who were preparing for the club's regular midnight opening.

Shortly after midnight, Wai Chin saw a man whom he recognized as Benjamin Ng enter the club. Ng drew a gun and ordered everyone to place their hands above their

heads. Wai Chin saw another man, whom he did not know but who was subsequently identified as Tony Ng, also draw a gun. Wai Chin then saw Willie Mak, whom he had known for about a month, standing on the upper level of the club with his gun also drawn. The three of them ordered the 10 other people present at the club to lie down on the lower level. Benjamin and Tony Ng then took precut pieces of rope out of a brown paper bag and proceeded to bind each person's hands and feet behind the person's back. Each person was then placed on his stomach. While Tony Ng was tying him, Wai Chin asked him to loosen the binds, pleading that he was an old man and couldn't harm anyone. Tony Ng complied.

After they had tied the victims, Benjamin and Tony Ng took their wallets and money. Mak neither tied people nor took money. He remained on the upper level and appeared to supervise the procedure. Four other people arrived while this process was occurring. All were subsequently bound and robbed. After everyone was tied and their money taken, Wai Chin heard and was hit by gunfire. He then lapsed into unconsciousness. Wai Chin testified that more than one gun was fired and that Ng held the gun with the "long barrel and small hole."

When Wai Chin awoke, he loosened the bindings, stumbled outside and told a passerby what had occurred. When the police arrived and entered the club, they found 12 people shot to death. The 13th subsequently died, and Wai Chin became the only surviving victim.

Wai Chin told the police that Benjamin Ng, Mak and a third person whom he did not know were the perpetrators of the incident. Several police officers then went to the home of Benjamin Ng's brother, Stephen Ng. Stephen informed the police that his brother lived with his girl friend, Kennis Izumi. Kennis and Benjamin Ng shared a bedroom in Kennis' parents' home.

At approximately 6:30 a.m., Lieutenant Holter knocked on the Izumis' front door. Kennis' mother, Connie Izumi, opened the door. The lieutenant identified himself, ex–

plained that Ng was a suspect in a multiple homicide and asked if he could enter to effectuate Ng's arrest. She granted permission to enter the home. Holter and Detective Baughman entered the home, opened the bedroom door, entered the bedroom, woke Ng from a sound sleep and arrested him.

While in the bedroom, Holter and Baughman saw two guns and a stack of money. They asked Ng to consent to a search of the bedroom, but he refused. After he took Ng out of the bedroom, Holter conferred with Major Douglass who had arrived at the home after the initial entry. They decided to procure a search warrant. They informed the Izumis that they would station an officer in front of the closed bedroom door to ensure that no one entered the bedroom. Upon hearing of this plan, George Izumi, Kennis' father, offered to allow the police to search his home. Major Douglass testified that he declined this invitation in favor of "[a] little more conservative approach to make certain we didn't err in any way."

At approximately 2 p.m. the police returned with the warrant and proceeded to search Ng's bedroom. They seized approximately $7,500 in cash, two loaded .38 caliber revolvers, an M–1 rifle and an ample supply of ammunition for all three weapons.

On February 24, 1983, the prosecutor filed an information charging Mak and Ng with 13 counts of aggravated first degree murder and 1 count of first degree assault. At the same time, the prosecutor gave notice of his intent to seek the death penalty against both defendants.

Subsequently, the two trials were severed and Ng was tried first. Immediately after the jury was selected in Ng's trial, Ng moved to sequester the jury. The trial court denied the motion stating, "I think considering the publicity there was very little loss of potential jurors because of publicity occurring to this point. So I would not propose to sequester the jury."

Ng then moved to suppress all items seized in the search of the bedroom. Ng conceded that under *Chimel v. Cali-*

*fornia,* 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969) items could have been seized at the time of the arrest. Ng maintained, however, that by placing a police officer in front of Ng's bedroom door, the police engaged in an unreasonable seizure of the bedroom. The trial court denied Ng's motion, finding that securing the bedroom was a reasonable action because it was "minimally intrusive and served to preserve evidence of a recent violent crime".

Subsequently, the State moved in limine to exclude as hearsay Mak's statement, "I shot them all." Ng argued that the statement was a declaration against Mak's penal interest and, therefore, admissible under ER 804(b)(3). The trial court granted the State's motion because the surrounding circumstances did not clearly indicate the trustworthiness of the statement.

During trial, Ng made three motions asking for either a mistrial, dismissal of the charges, or sequestration of the jury because of prejudicial publicity that occurred during the proceeding. Ng's motions were based on (1) a headline in the Seattle Post–Intelligencer announcing, in reference to Mak's statement, "Chinatown Confession Disclosed"; (2) an article in the Seattle Times in which a paragraph summarizing the prosecutor's opening statement contained inaccurate information; and (3) a phone call received by one of the juror's children in which the caller asked if the juror was "going to let that gook live or die." The trial court denied all three motions.

At trial, the State introduced evidence showing that two guns, a .22 caliber Ruger and a .22 caliber Colt, were fired during the shootings. An expert witness testified that the majority of the shots were fired by the Ruger .22. Although neither gun was found, the police seized a holster suitable for a Ruger .22 in Mak's bedroom.

In his closing argument in Benjamin Ng's trial, the prosecutor recalled that Wai Chin had testified that Benjamin Ng had the gun with a long barrel and small hole. The prosecutor demonstrated that a Ruger .22 has a long barrel and a small hole and concluded that the Ruger .22 was Ng's

gun that night. Indeed, the prosecutor implied that Ng owned the gun.

Although the prosecutor in his closing argument in Mak's trial never accused Mak of firing the Ruger .22, he did state that Mak purchased the Ruger .22 in White Center, "that very gun . . . that was fired at the Wah Mee twenty–six times . . ." Report of Proceedings, State v. Mak, cause 49966–7, at 3086.

However, in both trials, the prosecutor maintained that the jury need not concern itself with who fired the shots. In Ng's trial the prosecutor stated:

> In other words, it does not matter who did the shooting of any individual victim as long as you are able to say that the defendant and the other person who may have done the shooting shared a common frame of mind.

This precise theory was also argued by the prosecutor in Mak's trial:

> The defendant was an accomplice with Benjamin Ng and with Tony Ng and whoever actually held the gun, whoever actually pulled the trigger that sent the bullet into the brain of Jean Mar, it's irrelevant which one, because the defendant or an accomplice caused the death.

Report of Proceedings, Mak, at 3102. Furthermore, the prosecutor in both trials argued that Mak was the mastermind and Ng was his reliable right–hand man. In Ng's trial the prosecutor stated:

> If the defendant knew that "Willie" Mak had a plan to kill the people during the commission of this robbery and if he aided or agreed to aid "Willie Mak" in the commission of that crime, he then is an accomplice to aggravated murder.

The prosecutor repeated this theme in his closing argument in Mak's trial:

> How can Willie Mak seriously sit here and tell you that he was surprised or confused about how Benjamin Ng was acting? That's exactly the reason why he recruited Benjamin Ng. If you're going to need a guy who can shoot and kill people, he's a pretty reliable guy.

Report of Proceedings, Mak, at 3178.

The jury convicted Ng of 13 counts of aggravated murder and 1 count of first degree assault. At the penalty phase of the trial, the jury could not unanimously conclude that the State had proven the absence of mitigating circumstances beyond a reasonable doubt. Ng was, therefore, sentenced to 13 consecutive terms of life imprisonment without the possibility of parole and another consecutive term of life imprisonment. From the judgment and sentence, Ng appeals.

■ We first address Ng's contention that the police engaged in an unreasonable seizure of his bedroom when they stationed a police officer outside the bedroom door while obtaining a warrant.[1] Ng is correct in asserting that the impoundment of a room constitutes a seizure. *State v. Bean,* 89 Wn.2d 467, 472, 572 P.2d 1102 (1978). However, we find that the seizure here was lawful.

Recently, the United States Supreme Court refused to suppress evidence obtained after the police had unlawfully entered and occupied a residence until a search warrant could be issued. *Segura v. United States,* __ U.S. __, 82 L. Ed. 2d 599, 604, 104 S. Ct. 3380 (1984). Only a plurality of the Court, however, specifically constitutionally validated the seizure involved. The primary concern of the dissent, however, was that the premises were contained "from the inside" after an illegal entry. The dissent stated that

impoundment would be permissible even absent exigent circumstances when it occurs "from the outside"—when the authorities merely seal off premises pending the issuance of a warrant but do not enter.

*Segura,* 82 L. Ed. 2d at 621 n.15 (Stevens, J., dissenting). In summarizing *Segura,* Professor LaFave concluded that

[a]ll members of the Court appear to agree that the mere seizure of the premises and contents (that is, a mere

---

[1]Both parties agree that the initial entry into the Izumis' home was consensual. The State and Ng disagree, however, as to whether George and Connie Izumi could consent to the securing of Ng and Kennis Izumi's bedroom. Because we find the seizure lawful, even absent consent, we do not address this issue.

interference with possessory interests) is permissible on probable cause even absent exigent circumstances.

2 W. LaFave, *Search and Seizure* § 6.5, at 185 (Supp. 1985).

Here the police did not seize the entire home; they only seized the bedroom. Because they were in the home consensually and did not enter the bedroom during the impoundment, the police seized the bedroom "from the outside". Therefore, under the *Segura* analysis, the police needed only probable cause to impound the bedroom while a warrant was being secured. Because probable cause clearly existed and the warrant was obtained expeditiously, the seizure was reasonable.

Ng next contends that the trial court erred by excluding Mak's inculpatory statement in the guilt phase of Ng's trial. The morning after the killings at the Wah Mee Club, Willie Mak was arrested and questioned by the Seattle Police. During the questioning, Sergeant Sanford informed Mak that one victim had survived and identified Mak as one of the assailants. The sergeant then asked Mak the identity of the third person. Mak attempted to negotiate with the sergeant but was informed that no deals would be made. Mak then stated, "If I identify the third man, I'm dead." When pressed further Mak stated, "There is no third man, and I did all the shooting." Mak then indicated that he drove a Pontiac on the evening of the killings, when in actuality he borrowed his nephew's Opel. Subsequently, Mak repudiated the statement, "I did all the shooting."

The trial court excluded Mak's repudiated statement from the guilt phase of Ng's trial, finding that the corroborating circumstances did not clearly indicate the trustworthiness of the statement. On appeal Ng contends that the trial court should have admitted the statement under ER 804(b)(3) which provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against

another, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

(Italics ours.)

Inculpatory statements against penal interest are admissible under ER 804(b)(3) only if they meet a 3–part test: (1) the declarant must be unavailable; (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement must be corroborated by circumstances clearly indicating its trustworthiness. *State v. Valladares*, 99 Wn.2d 663, 668, 664 P.2d 508 (1983); *United States v. Sarmiento–Perez*, 633 F.2d 1092, 1098 (5th Cir. 1981). Ng makes two arguments to support his contention that Mak's statement should have been admitted into evidence. First, Ng argues that under ER 804(b)(3) corroborating circumstances must indicate only that the statement was made, not that it was true. Second, Ng maintains that if corroboration for the veracity of the statement is required, the standard is simply, could the statement be true. Ng concludes that because the evidence clearly indicates that the statement was made and that it theoretically could be true, the trial court erred by excluding it. Ng's arguments, which we will discuss separately, are without merit.

First, Ng cites *United States v. Bagley*, 537 F.2d 162 (5th Cir. 1976) to support his proposition that the corroborating circumstances must indicate only that the statement was made. In *Bagley,* the court, by analyzing the credibility of the witness, did evaluate the circumstances to see if the statement was actually made. Ng fails to mention, however, that the court also analyzed the trustworthiness of the declarant to determine if circumstances indicate that the statement was true. *Bagley,* at 167. Thus, the court engages in a 2–step analysis: (1) are there corroborating circum-

stances to clearly indicate that the witness is being truthful when testifying that the statement was made; and (2) do the circumstances clearly indicate that the declarant's statement was truthful. *Bagley,* at 167. *Bagley* thus imposes more stringent prerequisites for admissibility than other federal cases which only evaluate the second prong of the *Bagley* test. *See, e.g., United States v. Atkins,* 558 F.2d 133, 135 (3d Cir. 1977). Here, however, we need not choose between *Bagley*'s analysis of both the witness and declarant and *Atkins'* analysis of the declarant alone. Both *Atkins* and *Bagley* require an evaluation of the declarant's statement's trustworthiness prior to admissibility.

Here, the corroborating circumstances demonstrated that Mak's statement was not trustworthy. Mak made his statement in exasperation after the police refused to negotiate with him. He initially indicated he knew the third person involved. He then sandwiched the statement between two clear lies: (1) no third person was involved in the shooting, and (2) Mak drove a Pontiac on the evening of the shooting. In addition, Mak subsequently repudiated the statement. Because the surrounding circumstances do not clearly indicate the statement's trustworthiness, the trial court did not abuse its discretion in excluding the statement. *See United States v. MacDonald,* 688 F.2d 224, 233 (4th Cir. 1982), *cert. denied,* 459 U.S. 1103 (1983).

Second, Ng contends that even if the trustworthiness of the declarant's statements must be analyzed, the proper standard for admissibility is simply, could the statement be true. The wording and the legislative history of the rule clearly demonstrate that Ng's contention is meritless.

As submitted to Congress by the United States Supreme Court, rule 804(b)(4) provided that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible *unless corroborated.*" (Italics ours.) 56 F.R.D. 321 (1973). The House Judiciary Committee, however, amended the Supreme Court proposal and strengthened the corroboration requirement. The rule now provides that a declaration

against penal interest is not admissible unless "corroborating circumstances *clearly indicate* the trustworthiness of the statement." (Italics ours.) Fed. R. Evid. 804(b)(3). The committee strengthened the corroboration requirement because:

> [S]tatements . . . tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provision insuring trustworthiness. The proposal in the Court Rule to add a requirement of simple corroboration was, however, deemed ineffective to accomplish this purpose . . .

Fed. R. Evid. 804(b)(3) historical note, 28 U.S.C.A. 433 (1984). Thus, the minimal burden proposed by Ng runs counter to the history and plain wording of the rule. Because the "corroborating circumstances did not clearly indicate the trustworthiness of the statement", the trial court acted properly by excluding Mak's declaration.

We now address Ng's contention that the fifth and fourteenth amendments to the United States Constitution require that capital cases be initiated by grand jury indictment. The fifth amendment to the United States Constitution provides, in pertinent part, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . ." Ng contends that the due process clause of the Fourteenth Amendment makes this provision binding on the states in capital cases. Every American court that has confronted this contention has rejected it.

■■ Over 100 years ago, the United States Supreme Court held that the grand jury provision of the Fifth Amendment does not apply to state prosecutions. *Hurtado v. California,* 110 U.S. 516, 28 L. Ed. 232, 4 S. Ct. 111, 4 S. Ct. 292 (1884). Although the reasoning used in *Hurtado* has been specifically rejected, *see Powell v. Alabama,* 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55, 84 A.L.R. 527 (1932), the holding of the case continues to be cited approvingly by the United States Supreme Court. *See, e.g., Rose v. Mitchell,* 443 U.S. 545, 557 n.7, 61 L. Ed. 2d 739, 99 S. Ct. 2993

(1979) ("[T]here is no constitutional requirement that States institute prosecutions by means of an indictment returned by a grand jury . . ."); *Alexander v. Louisiana,* 405 U.S. 625, 633, 31 L. Ed. 2d 536, 92 S. Ct. 1221 (1972) ("Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury"). This court has concluded that because the United States Supreme Court criticized *Hurtado*'s reasoning without overruling the case, the *Hurtado* Court "correctly held that due process does not require a grand jury indictment . . ." *State v. Kanistanaux,* 68 Wn.2d 652, 656, 414 P.2d 784 (1966).

An analysis of the modern Supreme Court rationale for determining if a particular Bill of Rights provision applies to the states indicates that this court's holding in *Kanistanaux* was correct. In analyzing if a particular constitutional provision applies to the states, the Supreme Court asks "whether given this kind of system a particular procedure is fundamental—whether, that is, a procedure is necessary to an Anglo–American regime of ordered liberty." *Duncan v. Louisiana,* 391 U.S. 145, 149 n.14, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968). Considering that England abolished the grand jury system in 1933 and that only half of the states use the system as a regular adjunct of criminal prosecutions, the procedure cannot be said to be a fundamental component of the Anglo–American justice system. *Bowers v. State,* 298 Md. 115, 149, 468 A.2d 101 (1983). Thus, because of the long string of unbroken precedent and the Supreme Court's modern incorporation analysis, we refuse to hold that the federal constitution's grand jury provision is binding on the states.[2]

 Ng also contends that the trial judge erred by refus-

---

[2]In his pro se brief, Ng makes the novel argument that the grand jury provision of the Washington Territorial Code is still good law and requires indictments in all felony cases in Washington. This contention is frivolous. Article 1, section 25 of the state constitution specifically allows the State to proceed by information.

ing to sequester the jury prior to the jury deliberation. At the time of Ng's trial, CrR 6.7 provided, in pertinent part, that "[t]he jury may be allowed to separate if the court finds that good reason exists to believe that such would not jeopardize a fair trial."[3] Under this rule, the trial court has broad discretion to determine if sequestration is needed. *State v. Dictado,* 102 Wn.2d 277, 299, 687 P.2d 172 (1984); *State v. Cunningham,* 27 Wn. App. 834, 836, 620 P.2d 535 (1980). Indeed, this court will not presume that a defendant was prejudiced by a trial court's refusal to sequester a jury prior to jury deliberation. *State v. Smalls,* 99 Wn.2d 755, 766, 665 P.2d 384 (1983). To demonstrate that a trial court abused its discretion under CrR 6.7, the defendant must show that either (1) jurors were exposed to publicity during trial, or (2) the publicity during trial was of such a sensational or prejudicial nature that mere risk of exposure created a probability of prejudice. *State v. Dictado, supra; State v. Wixon,* 30 Wn. App. 63, 74–75, 631 P.2d 1033 (1981).

Ng presents no evidence that any juror saw or heard publicity during trial. Therefore, he must show that publicity during trial was so sensational or prejudicial that a probability of prejudice occurred.

Ng contends that a probability of prejudice was created by (1) a headline in the Seattle Post–Intelligencer (P–I) that stated "Chinatown Confession Disclosed"; (2) an article in the Seattle Times that erroneously summarized the prosecutor's opening statement; and (3) a phone call received by one of the juror's children in which the caller asked, "Are you going to let that gook live or die." Although the Times article contained a paragraph that misstated the prosecutor's opening statement, the underlying facts were true and the article was not sensational. The P–I headline pertained to Mak's confession and it, and the

---

[3]CrR 6.7 subsequently has been revised and now states: "During trial and deliberations the jury may be allowed to separate unless good cause is shown, on the record, for sequestration of the jury."

article to which it pertained, were factually accurate. In addition, the information that formed the basis of the article was revealed to the press by Ng's counsel after the State's motion to exclude the confession was granted. Finally, when the juror involved reported the phone call to the trial judge, the judge met with the juror in chambers along with the State and defense counsel. The judge and the two attorneys then questioned the juror. After soliciting questions from defense counsel and the State, the trial judge questioned the entire jury panel about the incident. The trial court concluded that no juror was prejudiced by the phone call. Our independent review of the record strongly supports this conclusion.

Because of the factual nature of the publicity during trial and the care taken by the trial court in assessing the jurors' reactions to the phone call, the defendant has not shown a probability of prejudice, and the trial court did not abuse its discretion by refusing sequestration.

Finally, Ng contends that the prosecutor denied him due process of law by arguing in his trial that he fired the Ruger .22 and subsequently arguing in Mak's trial that Mak fired that gun. We disagree.[4]

In both trials the prosecutor argued one basic theory. He maintained that Mak was the master planner who recruited his reliably ruthless friend Ng to help him carry out his plan. The prosecutor also emphasized in both trials that to convict the defendant of aggravated murder, the jury need not determine who actually fired the shots that killed the victims. In Ng's trial, the prosecutor did argue that Ng fired the Ruger. Contrary to Ng's assertion, however, the prosecutor at Mak's trial never argued that Mak fired that gun.

A review of the record indicates that, arguably, the prosecutor presented one factual inconsistency at the two

---

[4]Ng requests that we incorporate additional evidence into the record on review. Specifically, Ng asks us to consider a police report that demonstrates that the State knew, prior to Ng's trial, of Mak's contention that he did not use his gun holster for a Ruger .22. We granted the request and have considered the evidence. The police report does not, however, alter our conclusion.

trials. In Ng's trial, the prosecutor argued that the Ruger was Ng's; and, in Mak's trial, he argued that Mak purchased the gun. Even if these arguments are inconsistent, the inconsistency has no bearing on the basic issues at trial. Furthermore, unlike Ng, Mak testified at his trial, placing a new body of evidence on the record. To require the prosecutor to make identical arguments when the record contains different evidence contradicts the well established proposition that a prosecutor may argue reasonable inferences from the facts presented at trial. *See State v. Kroll*, 87 Wn.2d 829, 846, 558 P.2d 173 (1976).

One other court has addressed a similar contention. *Drake v. Francis*, 727 F.2d 990, 994 (11th Cir. 1984). In *Drake*, two men, Campbell and Drake, were charged with murdering and robbing a barber. Campbell was tried first. The prosecutor in his case argued that Campbell actually killed the barber and that Drake played a lesser role. In Drake's trial, 2 years later, the prosecutor relied on Campbell's physical inability to commit the murder on his own to implicate Drake in the actual murder as well. The circuit court characterized the two theories as "fairly consistent" and found no due process violation.

The King County Prosecutor's theories in the Mak and Ng trials were substantially more consistent than those in *Drake*. Clearly, Ng was not prejudiced by any arguments the prosecutor made in either case. Therefore, Ng was not denied due process of law.

We find that Ng's arguments on appeal are without merit, and we affirm the judgment and sentence.

DOLLIVER, C.J., BRACHTENBACH, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., and CUNNINGHAM, J. Pro Tem., concur.

UTTER, J., concurs in the result.