# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52885-1-II |
| Respondent, | |
| v. | |
| SAMUEL DAVID SCHMITTLER, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Samuel Schmittler appeals his conviction of second degree assault of a child with domestic violence and use of a position of trust aggravators. He argues that (1) the trial court erred in denying his request for an inferior degree offense instruction, (2) he was deprived of effective assistance of counsel when his attorney failed to object to certain inadmissible evidence, and (3) the trial court violated the separation of powers doctrine when it included a provision in his sentence that gave the Department of Corrections (DOC) discretion over setting community custody conditions. Schmittler raises additional arguments in a statement of additional grounds (SAG).

We hold that (1) the trial court properly declined to issue the inferior degree offense instruction because the evidence did not show that Schmittler committed third degree assault of a child to the exclusion of second degree assault of a child, (2) Schmittler was not deprived of

effective assistance of counsel because Schmittler has not shown, on the record before us, that his counsel's decision not to object to certain testimony was deficient performance or that he was prejudiced by counsel's performance, and (3) the trial court did not violate the separation of powers doctrine because DOC is empowered to set additional community custody conditions. We further conclude that none of the SAG claims warrant reversal of Schmittler's conviction.

Accordingly, we affirm.

## FACTS

### I. THE INCIDENT

On December 24, 2016, Schmittler was married to and living with Brandi La Fountain, who had two children—RW, who was nine years old, and DW, who was seven years old—from a prior relationship. Schmittler and La Fountain also had a child of their own, who was an infant in 2016. While La Fountain was at work, Schmittler was responsible for caring for the three children.

La Fountain was the primary residential parent of RW and DW, and she shared residential time of the boys with their father, Terry Warren. During the Christmas holiday in 2016, RW and DW spent Christmas Eve with Schmittler and La Fountain.

La Fountain was working until about 8:00 PM that evening. Schmittler made dinner for the boys, but RW did not eat his dinner within the time allotted. Doctors were concerned that RW was "extremely undersized" for his age and that he apparently had trouble eating. 1 Verbatim Report of Proceedings (VRP) at 41. Schmittler and La Fountain imposed a time limit on RW, during which RW was required to eat his entire dinner, because they did not know how else to resolve that issue. But because RW did not eat his dinner on time, Schmittler took RW into a back room and "spanked" him. *Id.* at 157.

2

When La Fountain returned home from work later that evening, she noticed that RW had a small bruise on his lower back. She confronted Schmittler regarding the bruise, and he admitted to spanking RW.

Warren picked his sons up from Schmittler and La Fountain's residence the following afternoon, on December 25, 2016. The next day, on December 26, Warren noticed bruising on RW's back. Warren photographed the bruises. Warren recalled that when he had picked RW up the night before, he was more withdrawn than usual. Warren sent the photographs to his sister, who had been living with him at the time, while she was at work, asking whether she knew what had happened to cause the bruising. One of Warren's sister's coworkers saw the photos and contacted police.

Officer Trevor Donnelly and Sergeant Aaron Elton arrived at Schmittler and La Fountain's home on December 26 to do a welfare check on the children. Both Schmittler and La Fountain were home when police arrived, but the two boys were not present. Schmittler and La Fountain invited the police into their home after the officers identified themselves and explained that they were there in response to a phone call they received regarding RW.

During this first contact with police, at which time the police had not yet begun a criminal investigation, Schmittler and La Fountain explained the discipline structure in their household. Schmittler brought a spiral-bound notebook and a bag of dice, with regular dice and some dice that went up to 20 sides, to the officers. The discipline procedure involved a dice game "where the offending child would roll a dice that would correspond to a predetermined punishment, such as wash the dishes. And then the parents would have their dice, the parent dice. And then they would roll, and that would act as a multiplier. So basically multiply the quantity or the time frame of

3

whatever the initial roll was." VRP (June 28, 2018) at 26. "Corporal punishment" was among the available consequences. *Id*.

Schmittler explained to the officers that the parents had administered "corporal punishment" in the past, until a parenting plan ordered them to discontinue using physical corrective measures on their children. *Id*. at 27. Schmittler claimed that he had not used this form of punishment on RW during this instance because of the parenting plan provision. Schmittler initially denied causing any injury to RW, and he informed officers that whatever bruising was reported to them may have been caused by RW falling from his bunk bed because RW had been known to fall from his bed.

Donnelly and Elton then went to Warren's residence. Once there, the officers spoke with both Warren and RW and looked at the photographs Warren took and the bruising on RW's back. The officers took photos of RW's back, which showed "[p]urple bruising, spanking his buttocks up onto his back and lower back." 1 VRP at 36. The officers transported Warren, RW, and DW to the hospital for medical evaluation. Additional photos of RW's bruises were taken at the hospital. RW was permitted to remain in Warren's care at that time.

After the officers left the hospital, they returned to Schmittler and La Fountain's residence, this time joined by Sergeant Ryan Heffernan. Prior to entering, one of the officers read the two parents their *Ferrier*[1] warnings from a card. One officer, Elton, spoke to La Fountain in their living room, while Donnelly and Heffernan spoke to Schmittler on the front porch.

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

Donnelly informed Schmittler that he returned to the residence because he had seen "significant bruising" on RW, and he wanted to speak with him further. VRP (June 28, 2018) at 32. Donnelly informed Schmittler of his *Miranda*[2] rights from a card. Schmittler acknowledged his rights and agreed to speak further with the officers. Although Schmittler initially denied causing RW's injuries at all, he eventually admitted that within the last week, he spanked RW about three times. However, Schmittler maintained that he did not cause the bruising the officers saw. The officers seized the notebook containing the punishment list and the game dice at the conclusion of their investigation.

RW and DW were initially placed in foster care following the incident. On January 18, 2017, RW and DW's paternal grandparents took custody of the boys. RW and DW's paternal grandmother, Elise Gehr, could see that RW was "[v]ery badly bruised" at that time. 1 VRP at 100. The bruising remained until the end of February or early March of that year. RW complained to his grandmother regarding pain in the bruised area for approximately one month.

The State initially charged Schmittler with second degree assault of a child with a domestic violence enhancement. The information was later amended to include a position of trust enhancement.[3]

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The State amended the information to include a particularly vulnerable victim enhancement but later withdrew the special allegation.

## II. CrR 3.5 HEARING

The trial court held a hearing pursuant to CrR 3.5 to determine whether statements Schmittler made to police officers were admissible. Donnelly testified consistently with the facts described above.

Schmittler also testified during the hearing. He explained that during the first contact with police, after they told him why they were there, he voluntarily let them into his home. He did not feel that he was detained and believed that he could speak freely with the officers. It was not until the second contact, when, Schmittler alleged, he attempted to reenter his home from the front porch but was told he could not do so, that Schmittler claimed he felt he was not free to terminate the interaction. Schmittler testified that he felt he had no choice but to answer Donnelly's questions because he "just kept repeating over and over that -- that he didn't believe me and that I was not going to be allowed to go inside until they got the real story." VRP (June 28, 2018) at 54. Further, Schmittler claimed that he was advised of his *Miranda* rights prior to his first conversation with the police but not prior to his second conversation with the police. This assertion differed from Donnelly's recollection that Schmittler was advised of his rights prior to the second conversation. Schmittler admitted to recalling his rights from the first interaction earlier that evening while the second contact was in progress.

The trial court concluded that Schmittler's statements to officers during both interactions were voluntary and admissible. The trial court found that the first interaction was noncustodial and consensual. The trial court also found that Schmittler was read his *Miranda* rights prior to the second contact, and it did not find credible Schmittler's statement that he was read his *Miranda* rights during the first interview. The trial court explained that given the exploratory nature of the

6

first interaction, there was no reason for the officers to provide *Miranda* warnings at that time. The trial court further found that the officers neither threatened nor coerced Schmittler into participating and that Schmittler understood his rights but never invoked them.

### III. TRIAL

The case proceeded to trial and the witnesses testified consistently with the facts as described above. Donnelly testified regarding the "'punishment game,'" and several pages from the notebook were admitted into evidence through Elton. 1 VRP at 29. Donnelly also testified regarding the parenting plan that prohibited corporal punishment with no objection from Schmittler's counsel. Both La Fountain and Warren also testified regarding the corporal punishment provision of the parenting plan. Schmittler did not object to the parenting plan provision testimony on either occasion.

Elton, one of the officers who was present for both contacts with Schmittler and La Fountain, testified that he learned from Donnelly that RW "had indicated that he had been beaten like 30 times." *Id.* at 115. Schmittler did not object to this testimony. No other witness testified that Schmittler struck RW 30 times. RW could not specifically remember the amount of times Schmittler spanked him, however he said it was "[m]aybe more" than 10 times. *Id.* at 74. Schmittler admitted to striking RW 3 times. DW stated Schmittler spanked RW 3 times as well; however, DW did not witness the spanking because Schmittler had closed the door to the bedroom before punishing RW. DW recalled that he knew RW had been spanked because he heard his brother screaming for 10 minutes from behind the closed door. DW further stated that his brother looked "[h]urt" when he came out "[b]ecause [he] saw him crying." *Id.* at 92.

Gehr testified regarding the extent of RW's injury following the incident. The State asked Gehr, "[W]hile that bruising was still there, how would it make you feel?" *Id.* at 103. With no objection from Schmittler, Gehr responded that she "was very sad for [RW]. I told him -- I'm sorry." *Id.* The State interjected stating, "I didn't mean to upset you, ma'am. I'm sorry." *Id.* Gehr proceeded to answer that "[i]f [she] could take the hurt away, [she] would. Everything that he's gone through." *Id.* Schmittler did not object during this exchange.

Schmittler proposed a jury instruction on the inferior degree offense of third degree assault of a child. The State admitted to not having fully researched the distinction between the charges but argued that to give the inferior degree instruction, Schmittler would have to show that he negligently, rather than intentionally, struck RW and the evidence that he intentionally struck the child was undisputed. Regarding the mens rea, the State posited that for third degree assault, there was not a separate mens rea requirement for the harm as opposed to the conduct that causes the harm.

Schmittler did not specifically address whether there are two distinct mens rea elements in third degree assault, but he noted that criminal negligence can also be proven even where the evidence shows the act was intentional. When asked, Schmittler was unable to refer the trial court to any cases that supported his assertion.

The trial court denied the inferior degree offense instruction, ruling that because "[t]he testimony here doesn't support that the act was anything but intentional," the evidence did not support a finding that Schmittler committed third degree assault to the exclusion of second degree assault. *Id.* at 184.

The jury found Schmittler guilty of second degree assault of a child, and it also found the domestic violence and use of a position of trust aggravators. The trial court entered a 10-year no-contact order.

The trial court imposed a 41-month sentence, the high end of the standard range. One provision within Schmittler's judgment and sentence provided that Schmittler must "[o]bey all laws and obey instructions, affirmative conditions, and rules of the court, DOC and [community corrections officer (CCO)]." Clerk's Papers (CP) at 117. Schmittler appeals.

## DISCUSSION

### I. INFERIOR DEGREE OFFENSE INSTRUCTION

Schmittler claims that he was entitled to an inferior degree offense instruction because there was "at least slight evidence" that he committed only third degree assault of a child based on criminal negligence as opposed to second degree assault of a child based on recklessness. Appellant's Opening Br. at 9. He argues that evidence shows he only negligently inflicted bodily harm accompanied by substantial pain on RW because the spanking was brief, the bruising did not develop immediately, and the bruise initially appeared to be only about the size of a half dollar coin.

We disagree and hold that the trial court properly denied the inferior degree offense instruction. We hold that the evidence did not support the inference that Schmittler committed third degree assault of a child to the exclusion of second degree assault of a child.

9

A.  LEGAL PRINCIPLES

Where an individual is charged with an offense that consists of different degrees, the jury

may find the defendant guilty of an inferior degree of the charged offense.  RCW 10.61.003.  The

party requesting an instruction on an inferior degree offense has the burden of showing that

> "(1) the statutes for both the charged offense and the proposed inferior degree
> offense proscribe but one offense; (2) the information charges an offense that is
> divided into degrees, and the proposed offense is an inferior degree of the charged
> offense; and (3) there is evidence that the defendant committed only the inferior
> offense."

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (internal quotation marks

omitted) (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)).

Here, the legal component of the test is satisfied because the statutes for both the charged

offense and the proposed inferior degree offense proscribe but one offense, and the charged offense

is divided into degrees, with third degree assault of a child being an inferior degree offense of

second degree assault of a child. *See Peterson*, 133 Wn.2d at 891.  Neither party disputes the legal

component of this test.

The factual prong is satisfied when "substantial evidence in the record supports a rational

inference that the defendant committed only the lesser included or inferior degree offense to the

exclusion of the greater offense." *Fernandez-Medina*, 141 Wn.2d at 461.  The evidence must be

enough to "affirmatively establish the defendant's theory of the case." *Id.* at 456.  The trial court

is required to consider all evidence presented at trial when deciding whether to provide the

instruction. *Id*.  The evidence is viewed in the light most favorable to the party that requested the

instruction. *Id.* at 455-56.  Where, as here, the trial court's decision regarding whether to instruct

the jury on a lesser included offense is based on a factual determination, we will review that

decision for an abuse of discretion. *State v. Condon*, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015).[4]

The second degree assault of a child statute incorporates the definition of second degree assault under RCW 9A.36.021. RCW 9A.26 A person is guilty of second degree assault when that person "[i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1)(a). Second degree assault is thus composed of two discrete acts: one is the assaultive act and the other is the infliction of substantial bodily harm. *State v. McKague*, 159 Wn. App. 489, 509, 246 P.3d 558, *aff'd*, 172 Wn.2d 802, 262 P.3d 1225 (2011). Each act must be established by a distinct mental state. *Id*. The corresponding mental state for the assaultive act is intent, and the corresponding mental state for infliction of bodily harm is recklessness. *McKague*, 159 Wn. App. at 509. A person acts recklessly "when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c).

RCW 9A.36.140(1) provides that a person is guilty of third degree assault of a child if the person commits assault as defined in either RCW 9A.36.031(1)(d) or (f). RCW 9A.36.031(1)(f) is relevant to this case and states that a person is guilty of third degree assault if that person, "[w]ith criminal negligence, causes bodily harm accompanied by substantial pain that extends for a period

---

[4] Although *Condon* involved a lesser included offense instruction as opposed to an inferior degree offense instruction, the analysis differs only with respect to the legal component of the test. 182 Wn.2d at 316; *see also Fernandez-Medina*, 141 Wn.2d at 455. Therefore, we review the factual component of the test for abuse of discretion under both circumstances. *See Condon*, 182 Wn.2d at 315-16.

sufficient to cause considerable suffering." A person acts with criminal negligence "when he or she fails to be aware of a substantial risk that a wrongful act may occur," and the "failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

B. ANALYSIS

Neither party disputes that Schmittler intentionally spanked RW. However, Schmittler asserts that because the evidence shows that he negligently, rather than recklessly, caused RW's harm, he was entitled to the inferior degree instruction even if he intended the act itself. Schmittler is mistaken. The evidence that Schmittler relies on in support of his claim tends to establish rather than negate his recklessness. Even if viewed in a light most favorable to Schmittler, the evidence would not lead a reasonable jury to find that Schmittler acted with criminal negligence as opposed to recklessness when he struck RW.

Schmittler claims that if "'even the slightest evidence'" supports the inferior degree offense, the trial court is compelled to so instruct the jury because a defendant has an "absolute" right to instruct the jury on the defense theory of the case. Appellant's Opening Br. at 8-9 (quoting *State v. Parker*, 102 Wn.2d 161, 166, 683 P.2d 189 (1984)). Schmittler claims the trial court erred in denying his instruction because the evidence met this minimal standard.

Schmittler is incorrect. Although the trial court must view the evidence in the light most favorable to the party requesting the instruction, the instruction may be given only where the evidence affirmatively establishes the proponent's theory of the case. *Fernandez-Medina*, 141 Wn.2d at 456. An inferior degree instruction will not be given if the proponent can only show that "the jury might disbelieve the evidence pointing to guilt" of the higher degree offense. *Id*.

Schmittler failed to affirmatively establish his theory of the case that he was only criminally negligent when he disciplined RW. *See id.* at 461. To demonstrate criminal negligence, Schmittler has the burden of identifying evidence that he failed to be aware of a substantial risk that a wrongful act may occur and that this failure was a gross deviation from the standard of care a reasonable individual would take under the circumstances. RCW 9A.08.010(1)(d); RCW 9A.36.031(1)(f). Schmittler cites to the facts that he struck RW 30 times and that DW heard RW screaming from behind the bedroom door during the incident to support his claim. Even if this evidence is considered in the light most favorable to Schmittler, it is unclear how it aids Schmittler's claim that he was not aware that his actions could cause RW's substantial injuries. To the contrary, this evidence tends to prove rather than negate the fact that Schmittler knew he was hurting RW during the disciplinary episode, but he continued to strike RW numerous times anyway. Schmittler does not identify any additional evidence that he acted with criminal negligence when he punished RW, nor does the record support such an inference.

Schmittler fails to demonstrate that a rational jury would also acquit him of the greater offense. *See Fernandez-Medina*, 141 Wn.2d at 456. Schmittler does not deny that he intentionally struck RW, thus the first component of second degree assault is not in dispute. *McKague*, 159 Wn. App. at 509. In addition, the evidence demonstrates that Schmittler knew of but disregarded a risk that RW would be substantially harmed by his actions, and Schmittler's decision to punish RW in this manner was a gross deviation from the standard of care that a reasonable person would exercise under the circumstances. *See* RCW 9A.08.010(1)(c).

Schmittler stated that he did not recall precisely how many times he spanked RW, but he admitted that it was "[a]t least three times." 1 VRP at 157. RW was screaming while Schmittler

spanked him. Physical punishment was employed with sufficient frequency in the household to compel a parenting plan provision that expressly prohibited use of corporal punishment on RW and DW. Schmittler attempted to use that provision of the parenting plan during the police investigation to deny that he caused RW's bruising. After Schmittler eventually admitted to police that he struck RW, he "broke down" and admitted to being "upset" at RW. *Id.* at 150.

In addition, Schmittler knew that RW was "extremely undersized" as compared to other nine-year-old children to the extent that doctors were concerned about RW's health. *Id.* at 41. Schmittler is about five feet and eight inches tall, and he weighs approximately 270 pounds. Schmittler therefore knew that he had the ability to seriously injure RW, but he recklessly disregarded that risk and proceeded to strike RW anyway, resulting in RW's extensive bruising.

Even if the evidence is considered in the light most favorable to the proponent of the instruction, the evidence did not support Schmittler's theory that he only negligently, rather than recklessly, caused RW's harm. *See Fernandez-Medina*, 141 Wn.2d at 461. Accordingly, the trial court did not abuse its discretion when it declined to issue a third degree assault instruction.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Schmittler claims that he was deprived of effective assistance of counsel when his counsel chose not to object to witness testimony that he claims was inadmissible and prejudicial. Schmittler asserts that he was prejudiced by defense counsel's deficient performance when (1) defense counsel failed to object to Officer Elton's hearsay within hearsay testimony that he was informed by Officer Donnelly that RW told him he was "'beaten like 30 times,'" (2) defense counsel did not to object to testimony regarding the parenting plan provisions that prohibited

corporal punishment, and (3) defense counsel failed to object to Gehr's testimony regarding the way seeing RW's bruising made her feel. Appellant's Opening Br. at 17.

We hold that the evidence in the record before us is insufficient to allow us to decide whether counsel's decision not to object to certain testimony or evidence fell below an objective standard of reasonableness. Even assuming, arguendo, that defense counsel's decision not to object constitutes deficient performance, Schmittler fails to demonstrate that he was prejudiced when this testimony was admitted. Consequently, Schmittler's ineffective assistance of counsel claim fails.

A. LEGAL PRINCIPLES

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015).

To prevail on an ineffective assistance of counsel claim, Schmittler has the burden of showing both that (1) his counsel's representation was deficient because it fell below an objective standard of reasonableness and (2) that he was prejudiced by this deficient performance. *State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018). When an ineffective assistance of counsel claim is raised in a direct appeal, we will not consider evidence outside of the trial record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). A defendant has the burden of showing both deficient performance and prejudice based on the record established in the proceedings below. *Id.* at 335, 337. If Schmittler fails to satisfy one prong of this two-part test, we need not consider the other. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

We give deference to counsel's decision-making and begin our analysis with a strong presumption that counsel's performance was reasonable. *State v. Grier*, 171 Wn.2d 17, 32, 42, 246 P.3d 1260 (2011). To rebut this presumption, the defendant has the burden of demonstrating an absence of any "'conceivable legitimate tactic explaining counsel's performance.'" *Id.* at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). This showing must be made based on the record developed below. *Linville*, 191 Wn.2d at 525.

To show prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862. A reasonable probability is one that is sufficient to undermine confidence in the trial's outcome. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017).

## B. DEFICIENT PERFORMANCE

Here, Schmittler fails to show that his counsel's conduct fell below an objective standard of reasonableness. Not only must Schmittler identify, from the record, the reason for counsel's decision not to object, but he must also demonstrate that the proffered reasons are neither strategic nor legitimate. *See Linville*, 191 Wn.2d at 525-26. And the decision regarding whether and when to object to trial testimony is a "classic example[] of trial tactics." *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019). "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007) (quoting *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989)).

There is no evidence in the record, nor does Schmittler point this court to any evidence in the record, explaining the reason behind defense counsel's decision not to object to the contested

testimony. Therefore, we cannot determine whether counsel's decisions were the product of reasonable trial strategy. *See Grier*, 171 Wn.2d at 32. Given that the decision regarding whether and when to object inheres in the overall strategy of the trial, we have no basis to conclude that counsel's performance was deficient.

C. PREJUDICE

Even if we were to assume that counsel's decision not to object lacked any conceivable legitimate or strategic purpose, Schmittler fails to demonstrate that had his counsel objected during the testimony he identified as problematic, the outcome of his trial would have been different. *See Kyllo*, 166 Wn.2d at 862. Therefore, Schmittler has failed to demonstrate that he suffered prejudice as a result of his counsel's performance. *See id.*

1. HEARSAY WITHIN HEARSAY TESTIMONY[5]

While Elton described the course of his investigation and provided context for his conversation with Schmittler and La Fountain that evening, he testified that "Donnelly had told me that [RW] had indicated he had been beaten like 30 times. That was the number we were provided." 1 VRP at 115. Defense counsel did not object to this testimony.

Schmittler claims that defense counsel's failure to object was prejudicial because this testimony involves two layers of hearsay to which no exceptions apply, and counsel's objection would have been sustained. Schmittler further claims that this testimony was prejudicial because

---

[5] Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. ER 801(c). Hearsay statements are inadmissible unless an exception or exclusion applies. ER 802. When testimony contains multiple layers of hearsay, each layer must separately conform to an exception or exclusion to be admissible. ER 805.

it was the only evidence presented that showed Schmittler struck RW 30 times, and it was used by the State to prove recklessness.

Schmittler fails to demonstrate that the outcome of his trial would have differed if the evidence had not been admitted. *Kyllo*, 166 Wn.2d at 862. While it is true that Elton was the only witness who stated that Schmittler "beat[]" RW 30 times, this fact was not critical to the State's argument. 1 VRP at 115. Rather, the State argued that the number of times Schmittler spanked RW is not clear, but the severity of Schmittler's actions is plainly evident from the extent of the bruising.

In closing, the State argued,

He spanked [RW] 10, 20, 30 times. [RW] doesn't quite remember two years later just how many times. The defendant says at least three times. He doesn't remember either. Probably more.

But he spanked [RW] enough times and so many times that bruise spread, not just on one concentrated area. . . .

It is spread all the way across his buttocks; below, above, into his lower back. . . .

So while the family didn't use that form of punishment, the defendant did. And his behavior in spanking [RW] over and over again repeatedly was a gross deviation from the conduct that a reasonable person would exercise in the same situation.

2 VRP at 216-17.

Schmittler testified that he did not recall precisely how many times he spanked RW, but he admitted that it was "[a]t least three times." 1 VRP at 157. Although RW could not recall how many times Schmittler spanked him, when asked whether it was more or less than 10 times, RW answered that it was "[m]aybe more." *Id.* at 74. The State acknowledged this factual discrepancy in closing, and it did not rely on the hearsay testimony as substantive evidence that Schmittler, in fact, struck RW 30 times.

18

Instead, the indeterminate number of times Schmittler spanked RW was part of a broader argument regarding the extent of RW's bruising. The State introduced evidence regarding RW's bruising primarily through photographs of the bruises themselves. Contrary to Schmittler's assertion that this testimony was the State's "strongest evidence" that he acted recklessly, the State relied on severity of RW's injury as evidenced by photographs of the bruises to demonstrate Schmittler's recklessness. Appellant's Opening Br. at 19.

Consequently, even assuming that there was no strategic reason justifying defense counsel's decision not to object to this testimony and that the objection to the hearsay within hearsay statement would have been sustained, Schmittler fails to demonstrate that he was prejudiced by this testimony.

2. PARENTING PLAN TESTIMONY

Schmittler claims that he was denied effective assistance of counsel because his counsel did not object to testimony pertaining to the parenting plan provision that prohibited use of corporal punishment. Schmittler asserts that this testimony was irrelevant under ER 402, or, if relevant, an objection would have been sustained under ER 403 because any probative value of this evidence was substantially outweighed by the danger of unfair prejudice and confusion of the issues. Schmittler argues that this evidence was prejudicial under ER 403 because the jurors may have believed that his violation of the court order was sufficient to prove guilt and because the parenting plan provision "painted him in a negative light." Appellant's Opening Br. at 19.

Schmittler does not provide a separate argument that this evidence was prejudicial with respect to the outcome of his trial, as he must in order to demonstrate that he received ineffective assistance of counsel. *Linville*, 191 Wn.2d at 518. Schmittler's claim fails even if we consider

Schmittler's assertion of prejudice pursuant to ER 403 as a substitute for prejudice in his ineffective assistance of counsel claim. There is no evidence in the record that the jury was confused in the manner Schmittler suggests. It is also unlikely, given the strength and totality of the evidence pointing to Schmittler's guilt, that the outcome of the trial would probably have been different absent the introduction of the parenting plan evidence. Schmittler has therefore failed to satisfy his burden of demonstrating that he suffered prejudice based on the trial court record. *McFarland*, 127 Wn.2d at 337.

3.   GEHR'S TESTIMONY

Schmittler claims that he was prejudiced when his counsel did not object to Gehr's testimony regarding how she felt upon seeing RW's bruises. We disagree because there is no evidence in the record that this testimony had any effect on the outcome of the trial.

The State asked Gehr, RW and DW's paternal grandmother, how seeing her grandson's bruises while he was in her care made her feel. Gehr responded by stating that she was "very sad for [RW]" and that "if [she] could take the hurt away, [she] would." 1 VRP at 103. Defense counsel did not object to this testimony.

Schmittler does not cite to any evidence in the record demonstrating that Gehr's testimony impacted the outcome of his trial. Schmittler's assertion that the State's question improperly appealed to the jury's passion and prejudice does not demonstrate that the jury was actually prejudiced against him upon hearing this testimony. Consequently, even assuming, without deciding, that the objection would have been sustained, Schmittler fails to meet his burden of demonstrating prejudice based on the trial court record. *McFarland*, 127 Wn.2d at 337.

### III. DELEGATION OF COMMUNITY CUSTODY CONDITIONS

Schmittler claims that the trial court violated the separation of powers doctrine because it abdicated its sentencing authority when it required that he follow all "'instructions, affirmative conditions, and rules of. . . DOC and CCO'" as part of his judgment and sentence. Appellant's Opening Br. at 22 (quoting CP at 117). We hold that DOC is vested with authority to establish additional community custody conditions based upon the defendant's risk to community safety and the trial court did not improperly delegate its sentencing authority.

*State v. McWilliams*, 177 Wn. App. 139, 311 P.3d 584 (2013), is on point. The defendant challenged the imposition of special community custody conditions designated as "conditions 'per DOC; CCO.'" *Id.* at 146. The defendant similarly claimed that the trial court improperly delegated its sentencing authority to the DOC. *See id.* at 153. This court held that such delegation was not improper. *Id.* at 154. This court reasoned that although the judiciary is vested with the authority to determine guilt and impose sentences, the execution of that sentence is administrative and "'properly exercised by an administrative body, according to the manner prescribed by the Legislature.'" *Id.* (internal quotation marks omitted) (quoting *State v. Sansone*, 127 Wn. App. 630, 642, 111 P.3d 1251 (2005)).

DOC is authorized under RCW 9.94A.704(2)(a) to "establish and modify additional conditions of community custody based upon the risk to community safety." The community custody condition at issue here, like the community custody at issue in *McWilliams*, is authorized by this statute because it refers broadly to DOC's authority to set the specifics of community custody conditions. It does not improperly delegate authority to DOC to define the parameters of

a vague condition created by the court at sentencing. *See id*. The community custody condition was proper.

## IV. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Schmittler claims that (1) he was denied his rights to due process under the Fourteenth Amendment because he was not indicted by a grand jury, (2) he did not consent to the officers searching his home during either contact, (3) the court did not have authority to enter a no-contact order before he was found guilty of the offense, and (4) the prosecutor engaged in conduct that violated his rights to due process during plea bargaining.

We hold that (1) Schmittler's due process rights were not violated when he was charged by an information rather than indicted by a grand jury, (2) the totality of the circumstances demonstrates that Schmittler's consent to the search was voluntarily given, (3) the trial court had authority to issue a no-contact order, and (4) the prosecutor did not violate Schmittler's rights to due process during plea bargaining.

## A. GRAND JURY INDICTMENT

Schmittler asserts that his due process rights were violated because he was not indicted by a grand jury as required by the Fifth Amendment to the United States Constitution. However, the State is not required to indict Schmittler by a grand jury to protect his due process rights.

The grand jury provision of the Fifth Amendment does not apply to state prosecutions. *State v. Ng*, 104 Wn.2d 763, 774-75, 713 P.2d 63 (1985). Article I, section 25, of the Washington Constitution provides that the State may prosecute an individual by either an information or indictment. Our Supreme Court has rejected the premise that a grand jury indictment is necessary to protect a defendant's due process rights. *Id*.

## B. VOLUNTARY WAIVER OF RIGHTS

Schmittler claims that he did not consent to the officers' entry and search of his home because he was under duress and feared that denying them entry would constitute obstruction of justice. Schmittler does not identify which evidence he claims should have been suppressed. Rather, he broadly complains that his constitutional rights were violated and that inadmissible evidence was collected. The record suggests that the spiral-bound notebook containing the "'punishment game'" and the dice from the punishment game were the items collected from the house. 1 VRP at 29.

There was no motion to suppress filed below, and while defense counsel initially objected when the State sought to admit the entire notebook containing the "'punishment book,'" defense counsel did not object when the State narrowed down the number of pages to be admitted from the notebook. *Id.* at 122. Under RAP 10.10, the appellate court is not obligated to search the record in support of claims made in a defendant's SAG. Based on the evidence contained in the record, there is nothing to suggest that Schmittler's consent was not freely and voluntarily given on both occasions, nor to suggest that all evidence acquired as part of that search and seizure was not properly admitted.

A warrantless search and seizure is per se unreasonable unless an exception to the warrant requirement applies. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of establishing an exception by clear and convincing evidence. *Id.* at 250.

An individual's consent to a search will excuse the warrant requirement. *State v. Thompson*, 151 Wn.2d 793, 803, 92 P.3d 228 (2004). The State must demonstrate that the consent was validly given by showing that (1) the consent was voluntary, (2) the person had the authority

to consent, and (3) the search did not exceed the scope of the consent. *Id*. Schmittler challenges only the voluntariness of his consent, and he claims that it was the product of duress and coercion.

Whether consent was voluntarily given is a question of fact to be determined by the totality of the circumstances. *State v. Russell*, 180 Wn.2d 860, 871, 330 P.3d 151 (2014). Relevant factors include whether *Miranda* warnings were given, the defendant's level of education and intelligence, and whether police advised the defendant of the right to refuse consent. *Id.* at 871-72. No single factor is dispositive. *Id.* at 872.

Schmittler claims that he felt coerced into consenting to the search during both contacts with officers because he was fearful that denying entry would constitute obstruction of justice. However, the record directly contradicts his assertions.

Schmittler testified during the CrR 3.5 hearing regarding the admissibility of statements he made to police. During that hearing, Schmittler admitted that he voluntarily allowed police to enter his home when they first contacted him. He also testified that he did not believe he was detained and that he believed he could speak freely with the officers. In addition, during the first contact with police, Schmittler spontaneously informed officers about the "'punishment game'" and willingly produced the notebook and game die for their inspection. 1 VRP at 29.

During the second contact, police officers advised Schmittler of his *Ferrier* rights before they entered his home and of his *Miranda* rights before they spoke with him. On both occasions, Schmittler indicated that he understood his rights and waived them. There is no evidence in the record that the officers made express or implied threats in order to force Schmittler's consent to a search of his home. The "'punishment game'" evidence was seized following the second contact.

*Id.* at 29. Consequently, nothing in the record demonstrates that Schmittler's consent was not voluntarily given.

C.  NO-CONTACT ORDER

Schmittler claims that the trial court violated his right to the presumption of innocence when it issued the no-contact order pretrial because he had not yet been convicted of assault at that time.  Schmittler asserts that the trial court had discretion to only order him not to harass or intimidate the victim.

This issue is moot.  An issue is moot if this court can no longer provide effective relief. *State v. Cruz*, 189 Wn.2d 588, 597, 404 P.3d 70 (2017).  Schmittler challenges the pretrial no-contact order, which expired at sentencing and was replaced by a new, 10-year no-contact order. There is no effective relief that we could provide for the now expired order.

We may review a moot issue if that issue is of continuing and substantial public interest. *Id.*  Schmittler's claim is more properly considered a challenge to the constitutionality of former RCW 10.99.040(2) and (3) (2015), which plainly allow a trial court to impose a preconviction no-contact order.

Schmittler has not asked this court to review this claim as one of continuing and substantial public interest.  We therefore need not evaluate whether the issue nevertheless merits review under this exception.  *See* RAP 10.10(c) (providing that "the appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors").  Moreover, our Supreme Court has held that trial courts are authorized to enter no-contact orders at various stages in a domestic violence prosecution,

including before trial and conviction, under former RCW 10.99.040(2) and (3). *State v. Shultz*, 146 Wn.2d 540, 544, 48 P.3d 301 (2002).

D. PLEA BARGAINING

Schmittler claims that the prosecutor engaged in witness intimidation, witness tampering, coercion, and obstruction of justice when she informed him that he could either accept the plea deal she offered or face a higher sentence by going to trial. We disagree with Schmittler's claim because a prosecutor has discretion when deciding whether to enter into a plea bargain.

Prosecutors are vested with broad discretion when determining whether to charge a crime or enter into a plea bargain. *State v. Moen*, 150 Wn.2d 221, 227, 76 P.3d 721 (2003). However, this discretion is not "'unfettered,'" and prosecutors may not exercise this discretion in a manner that violates due process. *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 495, 30 L. Ed. 2d 427 (1971)). Schmittler effectively claims that because the prosecutor offered him one plea deal that he did not wish to accept, and she explained that he faced a more severe sentence by going to trial, she committed witness intimidation, witness tampering, coercion, and obstruction of justice. Schmittler's claims that these measures constitute witness tampering, witness intimidation, coercion, and obstruction of justice are unfounded, and the prosecutor was well within her discretion not to continue bargaining with Schmittler after he declined her offer. *See id*. Moreover, Schmittler does not show that he suffered prejudice from the prosecutor's extension of the pretrial offer, and he does not explain what remedy he wants this court to provide him.

CONCLUSION

The trial court did not err when it denied Schmittler's request for an inferior degree offense instruction because the evidence did not demonstrate that he committed third degree assault of a

child to the exclusion of second degree assault of a child. Schmittler has not shown that he was deprived of his right to effective assistance of counsel because he fails to show that his counsel's decisions were not the product of legitimate trial strategy. Moreover, even if we assume that counsel's decision not to object was deficient performance, Schmittler has failed to demonstrate that he suffered prejudice. Schmittler's judgment and sentence was valid because the superior court did not unlawfully delegate its sentencing authority to the DOC. In addition, none of Schmittler's SAG claims warrant reversal of his conviction.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

GLASGOW, J.